IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JOHN A. MILES, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | No. 08 C 2734 |
| HOME DEPOT USA, INC., | ) ) ) | |
| Defendant. | ) | |

MEMORANDUM OPINION AND ORDER

JAMES F. HOLDERMAN, Chief Judge:

Plaintiff John A. Miles ("Miles") alleges that his former employer, defendant Home Depot USA, Inc. ("Home Depot"), discriminated against Miles on the basis of his sex and age in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), and the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621 *et seq.* ("ADEA"), when Miles was constructively discharged from his position as store manager of Home Depot's Elk Grove, Illinois store. Now pending before the court is Home Depot's motion for summary judgment. (Dkt. No. 29.) For the reasons set forth below, Home Depot's motion for summary judgment is granted, and its request for attorneys fees is denied.

BACKGROUND[1]

Miles was first hired by Home Depot in September 1994 as an Assistant Store Manager. In February 1997, he was promoted to Store Manager of the Niles, Illinois store. While at the Niles store, Miles received an Associate Performance Notice ("APN") from District Manager

---

[1] All facts are undisputed, unless otherwise noted..

1

Gregg Gerstenberger for poor job performance.  Thereafter, in November 2000, Miles transferred to the position of Store Manager of the Evanston, Illinois store.  On August 9, 2001, Miles received another APN from District Manager Hector Johnston  ("Johnston") for poor job performance at the Evanston store.  The August 9, 2001 APN stated that Miles had "30 days to show measurable and sustainable improvement in the store standards" before being terminated.  (Dkt. No. 44-2 ("Pl.'s Add'l Facts") ¶ 2.)  Despite this 30-day time frame, Miles received a second APN from Johnston on August 24, 2001, which threatened to terminate Miles.  Miles' initial term of employment with Home Depot came to an end on August 24, 2001, when Miles signed off on the August 24, 2001 APN and subsequently resigned.

At the invitation of Home Depot District Manager John Sheehan, Miles reapplied for a position with Home Depot and resumed his employment with Home Depot as an Assistant Store Manager at the Palatine, Illinois store on April 1, 2002.  In December 2002, Miles became the Operations Assistant Store Manager at the Palatine store and, in September 2003, he transferred to the Brickyard store in the same position.[2]  Miles then became Store Manager of Home Depot's Elk Grove store on May 17, 2004.

---

[2] Miles' testimony on the exact position he held a the Palatine and Brickyard stores is inconsistent.  In his March 4, 2009 deposition, Miles stated that he was the "store operations manager" of the Palatine store, a position that he identified as that of an Assistant Store Manager.  (Def.'s Ex. 39 ("Miles 3/4/09 Dep.") 69:23–70:18.)  In his July 20, 2009 affidavit, Miles again stated that he was the Operations Assistant Store Manager of both the Palatine and Brickyard stores.  (Pl.'s Ex. A ("Miles 7/20/09 Aff.") ¶ 2.)  Elsewhere in the same affidavit, however, Miles stated that he was the Store Manager at the Palatine and Brickyard stores.  (Miles 7/20/09 Aff. ¶ 6.)  "Where deposition and affidavit are in conflict, the affidavit is to be disregarded unless it is demonstrable that the statement in the deposition was mistaken." *Russell v. Acme-Evans Co.*, 51 F.3d 64, 67–68 (7th Cir. 1995.)  No such mistake is evident here.

At the Elk Grove store, Miles' direct superior was District Manager Mike Koulianos ("Koulianos"). The Elk Grove store was a relatively newer store compared to other Home Depot stores in the area, and was approximately six months old at the time Miles became the Store Manager. On May 29, 2004, less than two weeks after Miles began working at the Elk Grove store, Koulianos and Regional Vice President Mike Roy conducted a store walk with Miles. Miles took notes during the May 29, 2004 store walk concerning a number of "action items" he needed to address, but he did not consider the store walk to be "unsatisfactory." (Dkt. No. 31 ("Def.'s SMF") ¶ 27.)

In February 2005, Miles was given an annual review.[3] (Def.'s Ex. 8 ("February 2005 Annual Review").) In this review, Miles received a rating of "P" for overall performance,[4] "3" for leadership,[5] and "=" for potential.[6] The February 2005 Annual Review also identified six of Miles' "key strengths," (Pl.'s Add'l Facts ¶ 11), as well as three "key development needs" and several "areas to focus," including "missed sales by -$1.4 million, missed profit plan by 217,000, spr avg was 88%, workers comp was over $176,000, curriculum training was 66% and payroll

---

[3] It is not clear to the court whether this review was actually issued in February 2005 or March 2005. (*Compare* Def.'s SMF ¶ 31 *with* Pl.'s Add'l Facts ¶ 10.) Both dates are "undisputed" by the parties. The court has chosen the February 2005 date as the more reliable of the two, because this was the date used by Koulianos in his March 8, 2005 Performance Memo.

[4] The Overall Performance code is as follows: O stands for "Outstanding," V stands for "Achiever," P stands for "Performer," and I stands for "Imp. Required." (February 2005 Annual Review at 1.)

[5] The Leadership code is as follows: 1 stands for "Exemplary," 2 stands for "Effective," 3 stands for "Acceptable," and 4 stands for "Deficient." (February 2005 Annual Review at 1.)

[6] The Potential code is as follows: * stands for "High Potential," + stands for "Promotable," = stands for "Grow in Position," and - stands for "Placement Issue." (February 2005 Annual Review at 1.)

was over plan." (Def.'s SMF ¶¶ 32-33.)

Koulianos followed up the February 2005 Annual Review with a March 8, 2005 performance memo to Miles. (Def.'s Ex. 7 ("Performance Memo").) In the Performance Memo, Koulianos pointed out that "[t]he store manager is responsible for making sure key initiatives are being met each and every month" and Koulianos documented the specific performance metrics that Miles had achieved and missed, concluding "[a]s you can see you missed many metrics. The expectations are that you will make these each month. I expect going forward that your stores [sic] performance will improve. Please submit your Action Plan to improve." (Def.'s SMF ¶ 30.)

Following Miles' February 2005 Annual Review, various Home Depot managers conducted store walks of the Elk Grove store with Miles in April, May, and June 2005. Miles took notes for each walk. (Def.'s Ex. 9 ("Miles' Spring 2005 Notes").) During these store walks, Miles' supervisors pointed out areas that needed to be addressed at the Elk Grove store. The parties dispute whether Miles' notes demonstrated a "less than satisfactory" view of Miles' performance (as characterized by Home Depot in its motion) or whether the notes merely recorded "opportunities" for the Elk Grove store to improve (as characterized by Miles in his deposition testimony). (*See* Def.'s SMF ¶ 35.) It is undisputed that Miles' notes from the June 6, 2005 store walk state "WE MUST GET GREEN!," in reference to Home Depot's ranking system for inventory prep, where "Green means that you're good. Yellow means that there's issues. Red means there's cause for alert." (Def.'s SMF ¶ 37 (citing Miles' Spring 2005 Notes at JM 001558 and quoting Miles' 3/4/09 Dep. at 139).) Miles does not recall the Elk Grove store "being anything other than green." (*Id.*)

On June 10, 2005, Koulianos emailed Miles and the Elk Grove Assistant Store Managers, noting he was "concerned with the SALES trend that your store is showing." (Def.'s Ex. 10; Def.'s SMF ¶ 39.) Koulianos noted six areas of specific concern and recognized the need "to do a 180 here." (*Id.*)

On June 30, 2005, Koulianos and District Human Resources Manager Mike Wong ("Wong") met with Miles to put him on a 60-day performance improvement plan. (Def.'s Ex. 11 ("June 2005 PIP").) The June 2005 PIP noted Miles' inability "to maintain/set consistent standards in major aspects of the business for store 6701 for the first 6 months of FY05," and identified specific areas in which the Elk Grove store was "not meeting the expectations," not "consistently maintain[ing] Divisions standards," and was "worst" or "last" in the district. (Def.'s SMF ¶ 42.) The PIP also included four "major areas of opportunity," and concluded:

> **"Based on the above, you are presently working below Home Depot standards and expectations." "You are hereby placed on a Performance Improvement Plan, not to exceed 60 days in duration effective immediately (6/30/2005). We will meet for touch-base sessions that will be held weekly in order to evaluate your present performance. "This requires immediate and consistent improvement ongoing." "Failure to provide this will result in termination of your employment."**

(*Id.* (bold type and quotation marks in original exhibit).)

Soon after receiving the June 2005 PIP, Miles took a medical leave of absence for a low back sprain and sleep apnea from July 2, 2005 through October 3, 2005. Upon his return to work, on October 15, 2005, Miles submitted his "game plan for improvement" to Koulianos, assuming that he was subject to the terms of the PIP. (Def.'s SMF ¶ 46.) However, Koulianos' own employment with Home Depot ended on October 24, 2005. The acting District Manager who took over for Koulianos, Patty Stoddard, did not follow up with Miles regarding the June 2005

5

PIP.

In February 2006, Jeff Ferreira ("Ferreira") became the permanent District Manager over Miles' district. Regional Human Resources Manager Jody Beemsterboer ("Beemsterboer") was Ferreira's Human Resources partner. Ferreira and Beemsterboer were unsuccessful in their attempts to locate a written copy of the June 2005 PIP after taking over Miles' district. However, Wong and Miles both explained the general topics covered in the June 2005 PIP to Beemsterboer and Ferreira, respectively.

On February 17, 2006, Ferreira and Beemsterboer met with Miles to discuss his current status and the need for improvements at the Elk Grove store. It was either at this meeting or soon thereafter that Ferreira told Miles he was still on PIP status. However, Ferreira subsequently gave Miles a satisfactory performance review on February 27, 2006, which effectively took Miles off the June 2005 PIP. (Def.'s Ex. 18 ("February 2006 Performance Review").)

Despite the effect of the February 2006 Performance Review on the June 2005 PIP, "[Ferreira] was always elusive and didn't give distinctive answers" when Miles asked Ferreira for clarification about the status of his PIP. (Pl.'s Add'l Facts ¶ 19; *see also* Miles 3/4/09 Dep. 174:11–23.) Additionally, although Miles, Ferreira, and Beemsterboer had agreed during the February 17, 2006 meeting to meet on March 14, 2006 to go over a game plan Miles had devised to address the concerns set forth in the June 2005 PIP, neither Ferreira nor Beemsterboer appeared for the March 14, 2006 meeting and no other meetings were scheduled to address the status of the June 2005 PIP.

Although Miles was given a satisfactory performance review on February 27, 2006 (*e.g.*, P, 3, =) and the review noted Miles' "key strengths" in the areas of work ethic and integrity, the

6

summary portion of the February 2006 Performance Review stated:

> John has improved his processes relating to MAP and SHRINK awareness. However, John continues to have opportunities in "grand opening ready" and standards. He has been inconsistent with improvement in the condition of his store, maintenance standards, and leadership. Specifically, general aisle shoppability, shelf maintenance, overhead organization, bulk area orderliness. John has not shown improvement in the in stock position of his store and will need to aggressively work these areas and fully meet the company expectation. John needs to show immediate improvement in these areas and must sustain improvements or will result in his termination.

(Pl.'s Add'l Facts ¶ 22; Def.'s SMF ¶ 58.)

On March 21, 2006, Ferreira and Beemsterboer documented a conversation with Miles as follows: "Call to ARM's walk — PIP follow up. Store received 'RED' status" in four categories. (Def.'s SMF ¶ 59.) On April 12, 2006, Ferreira gave Miles his annual review. (Def.'s Ex. 19 ("April 2006 Annual Review").) Miles was again given a satisfactory rating of "P, 3, =," but the review also contained numerous "key development needs." (Def.'s SMF ¶ 60.) The April 2006 Annual Review described various game plans developed by Miles that "did not materialize" and noted that the Elk Grove store "was the only store in the district that did not pass with a 100% on the initial hazmat performance review," that it "consistently ranks the lowest in pack down and In-stock measures in the district," and that it "was averaging open days of 5.5 consistently the worst execution in the district." (*Id.*) The review concluded "John has not demonstrated consistency in executing the basics of supporting and driving the sales of multiple businesses, managing the numerous operational cornerstones such as safety and in-stock while developing and motivating a strong store team." (*Id.*)

Ferreira conducted another store walk with Miles on April 20, 2006, and he subsequently met with Miles to review "major issues based off store walk application metrics." (Def.'s SMF ¶ 62.) On May 5, 2006, Miles' store was visited by Ferreira, four additional District Managers, and

a Regional Vice President. Ferreira's notes from the May 5, 2006 store walk indicate that "[Miles] was asked about why the store was missing plan and his action plans to address deficiencies," and his notes identify various performance concerns and "leadership issues" discussed with Miles on the store walk. (Def.'s SMF ¶ 64.)

On May 16, 2006, Ferreira and Beemsterboer performed yet another store walk with Miles, met with him for approximately five to six hours, and also prepared an "Overall Business Performance Review." (Def.'s Ex. 22.) The written review identified several areas in which the Elk Grove store was failing to meet its planned goals and noted specific staffing plans that were discussed with Miles on May 16, 2006. The parties dispute whether Ferreira and Beemsterboer told Miles he would have to take over the open specialty Assistant Store Manager position and the open pro Department Head position at the Elk Grove store until these positions were filled. The parties also dispute whether Miles was instructed not to hold his existing Assistant Store Managers accountable for their job obligations at that time. The Overall Business Performance Review concluded, "[Miles] needs to be more engaged in both specialty and pro core business. It was explained that a hands off approach is not acceptable and he needs to provide better and more effective leadership." (Def.'s SMF ¶ 66.)

Ferreira described the May 16, 2006 store walk as "the straw that broke the camel's back." (Def.'s SMF ¶ 67.) After what he saw at the Elk Grove store that day, Ferreira made the decision to begin the termination process. On May 17, 2006, Ferreira called Miles and told him that "things were going to happen, they were going to happen fast," and "you're going to be fired," and "I'll deny it, but you're going to me terminated." (Pl.'s Add'l Facts ¶ 26.) Miles subsequently gave Ferreira a copy of his October 15, 2005 "game plan" to address concerns at the

Elk Grove store, although the plan had been re-dated May 18, 2006.

Ferreira spoke to Beemsterboer, who began seeking termination approval via e-mail on May 24, 2006. Ashley Goldsmith, Vice President of Human Resources for Home Depot's Northern Division, approved Miles' termination on May 25, 2006. However, Miles was not given an official termination notice because he resigned from his employment with Home Depot on May 26, 2006. In his resignation letter, Miles cited the inconsistent way he was treated, his failed attempts to get answers, and Home Depot's refusal to give him clear direction as reasons for his resignation.

Miles was born on July 13, 1964, and was 41 years old at the time of his resignation. Miles' replacement as Store Manager, Nicholas Karch ("Karch"), was born on June 13, 1977, and is nearly thirteen years younger than Miles.

## LEGAL STANDARD

A grant of summary judgment is proper when the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The movant bears the initial responsibility of informing the court of the basis for its motion and identifying the evidence it believes demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). "Once a party has made a properly-supported motion for summary judgment, the opposing party may not simply rest upon the pleadings but must instead submit evidentiary materials that 'set forth specific facts showing that there is a genuine issue for trial.'" *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008) (quoting Fed. R. Civ. P. 56(e)). "The mere existence of a scintilla of evidence in support of the plaintiff's

9

position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Stephens v. Erickson*, 569 F.3d 779, 786 (7th Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

When ruling on a motion for summary judgment, the court must consider the facts before it in the light most favorable to the nonmoving party, drawing all reasonable inferences in the nonmoving party's favor. *Woodruff v. Mason*, 542 F.3d 545, 550 (7th Cir. 2008). The court does not make credibility determinations or weigh conflicting evidence. *Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005). Summary judgment will be granted in favor of the moving party if there are no genuine issues as to any material fact, such that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); see also *Celotex*, 477 U.S. at 322–23.

## ANALYSIS

1. Title VII Sex Discrimination Claim

Under Title VII, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). Home Depot argues that it cannot have discriminated against Miles on the basis of his sex, because Home Depot hired another male employee to fill Miles' position and there are no background circumstances that would support a finding that Home Depot is inclined to discriminate against men. *See Gore v. Ind. Univ.*, 416 F.3d 590, 592 (7th Cir. 2005). Miles has made no effort to respond to Home Depot's argument or to otherwise pursue his sex discrimination claim. Because Miles has failed to come forward with any evidence demonstrating a genuine issue of material fact requiring trial, the court grants summary judgment

in favor of Home Depot on Miles' sex discrimination claim.

2. ADEA Age Discrimination Claim

Under the ADEA, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). To state a claim of age discrimination, the plaintiff must be at least 40 years old at the time of the adverse employment action. 29 U.S.C. § 631(a). Plaintiffs pursuing claims under the ADEA can proceed under either the direct or indirect method of proof. *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 641 (7th Cir. 2008).

Under the indirect method of proof, which Miles has elected to utilize in this case, Miles must first establish a *prima facie* case of discrimination by show that (1) he is a member of a protected class; (2) his performance met Home Depot's legitimate expectations; (3) despite his performance, he was subject to an adverse employment action; and (4) Home Depot treated similarly situated employees outside of his protected class more favorably. *Id.* If Miles establishes a *prima facie* case of age discrimination, the burden shifts to Home Depot to set forth a legitimate, non-discriminatory reason for its actions. *Id.* at 641–42. Once Home Depot has met "this minimal threshold," the burden shifts back to Miles to demonstrate that Home Depot's stated reason is a mere pretext for discrimination. *Id.* at 642. Throughout this process, "the ultimate burden to prove intentional discrimination always remains with [the plaintiff]." *Martino v. MCI Commc'ns Servs., Inc.*, __ F.3d ___, No. 08-2405, 2009 WL 2224914, at *4 (7th Cir. July 28, 2009). This means "the plaintiff must prove that, but for his age, the adverse action would not have occurred." *Id.* at *6 (citing *Gross v. FBL Fin. Servs., Inc.*, ___ U.S. ___, 129 S. Ct. 2343

11

(2009)).

It is undisputed that Miles is a member of a protected class (individuals 40 years old or older) and that he was subject to an adverse employment action.[7] It is also undisputed that Miles was replaced by a "substantially younger" employee because of the over-twelve-year difference between the ages of Miles and Karch, who replaced him in the position of Store Manager. *See Hartley v. Wis. Bell, Inc.*, 124 F.3d 887, 893 (7th Cir. 1997) (holding that a ten-year difference in ages between the plaintiff and his replacement is presumptively substantial).

The parties' main dispute is whether Miles was meeting Home Depot's legitimate expectations at the time his employment was terminated. Home Depot agues that Miles cannot establish a *prima facie* case of age discrimination, because he cannot show that he was meeting Home Depot's legitimate expectations. Home Depot further argues that Miles' consistently poor performance was a legitimate, non-discriminatory reason for Home Depot's actions. Miles, on the other hand, contends that (1) the record demonstrates a disputed question of material fact as to whether he was meeting Home Depot's legitimate expectations; and (2) Home Depot's expectations were not legitimate, instead "put[ting] Miles in a position to fail." (Pl.'s Resp. at 9.) "[I]f the plaintiffs argue that they have performed satisfactorily and the employer is lying about the business expectations required for the position, the second prong and the pretext question seemingly merge because the issue is the same—whether the employer is lying." *Hague v.*

---

[7] Home Depot characterizes the adverse employment action as a "looming" termination. (Dkt. No. 30 ("Def.'s Mem.") at 12.) Miles characterizes the adverse employment action as "intolerable working conditions . . . effectively result[ing] in a constructive discharge." (Dkt. No. 40 ("Pl.'s Resp.") at 6.) The court need not determine the exact nature of the adverse employment action suffered by Miles for purposes of its analysis, as this element of the *prima facie* case is conceded by Home Depot.

*Thompson Distrib. Co.*, 436 F.3d 816, 823 (7th Cir. 2006). In this situation "the two inquiries may be merged and considered together." *Faas*, 532 F.3d at 642. Accordingly, to survive summary judgment, Miles must present evidence that Home Depot's given reason for its employment actions—that Miles was not meeting Home Depot's expectations—"is factually baseless, was not the real motivation for the decision, or was insufficient to motivate the decision." *Lindsey v. Radioshack Corp.*, 452 F. Supp. 2d 848, 855 (N.D. Ill. 2006) (citing *Gusewelle v. City of Wood River*, 374 F.3d 569, 575 (7th Cir. 2004)).

Miles first notes that he received satisfactory (*e.g.*, P, 3, =) performance reviews in February 2005, February 2006, and April 2006 and that these reviews also contain language identifying Miles' strengths as a leader, suggesting that he was meeting Home Depot's expectations. The court finds that this evidence is not sufficient to raise a genuine question of material fact on the question of pretext. Miles' February 2005 Annual Review was issued at the beginning of Miles' documented performance problems as the Elk Grove Store Manager, well over a year before Miles' employment with Home Depot was terminated. As such, the February 2005 Annual Review is of limited relevance to the question of whether Miles was meeting Home Depot's legitimate expectations at the time of his termination.[8] Although Miles is correct in noting that he received a satisfactory rating on his February 2006 Performance Review, this review also specifically included language warning Miles that he would be terminated if he did not show "immediate" and "sustain[ed]" improvement in several key areas. (Def.'s SMF ¶ 58.) Soon thereafter, the Elk Grove store received a "RED" status in four categories during a store

---

[8] Similarly, Miles' long tenure with Home Depot does not by itself reflect whether Miles was meeting Home Depot's expectations as the Elk Grove Store Manager at the time his employment with Home Depot was terminated.

13

walk.  The language in the April 2006 Annual Review demonstrates that Miles' performance had not improved, noting plans that "did not materialize," the Elk Grove store's consistently "lowest" or "worst" performance in the district, and Miles' failure to demonstrate "consistency in executing the basics of supporting and driving the sales of multiple businesses, managing the numerous operational cornerstones such as safety and in-stock while developing and motivating a strong store team."  (Def.'s SMF ¶ 60.)  Three more store walks between the time of Miles' April 2006 Annual Review and the termination of his employment also fail to demonstrate any improvement in Miles' (or the Elk Grove store's) performance.  The fact that the February 2006 Performance Review and the April 2006 Annual Review gave Miles a satisfactory performance rating and contained some mention of Miles' positive attributes as a Store Manager does not mean that Home Depot's explanation for its employment actions was "factually baseless," nor does it point to some other (unlawful) motivation for Home Depot's employment actions.  On this record, no reasonable jury could find that Miles was meeting Home Depot's expectations at the time he was terminated.

Miles further argues that Home Depot's expectations were unreasonable (and pretextual) because his supervisors failed to fill the pro Department Head position and the specialty Assistant Store Manager position at the Elk Grove store, while keeping Miles on the June 2005 PIP for at least eight months.  In support of this argument, Miles cites to *Lindsey v. Radioshack Corp.*, 452 F. Supp. 2d 848, 855 (N.D. Ill. 2006).  *Lindsey* is distinguishable from this case, however, because the supervisors in *Lindsey* actually referred to the plaintiff's age in conversations about his performance problems, asking whether Lindsey planned to retire soon and suggesting that he apply for a job with an employer who was "hiring older people."  *Id.* at 851–52.  The court in

14

*Lindsey* also found it suspicious that the plaintiff was terminated at a time when his documented performance was improving, and where other managers with performance deficiencies had been demoted rather than terminated. *Id.* at 856. In this case, there is no evidence that any decision-maker at Home Depot mentioned Miles' age at any time, either to Miles or to anyone else. There is also no evidence that Miles' performance was improving, or that other, younger Store Managers with similar performance issues were treated differently. At most, Home Depot's failure to consider the under-staffed nature of the Elk Grove store could be considered unfair, but this does not mean that Home Depot's explanation was dishonest or insincere. *See Faas*, 532 F.3d at 642; *Hartley*, 124 F.3d at 890 ("Plaintiffs lose if the company honestly believed in the nondiscriminatory reasons it offered, even if the reasons are foolish or trivial or even baseless"). On this record, no reasonable jury could conclude that Home Depot's reasons for its actions were a pretext for age discrimination.

3.  Attorneys' Fees and Costs

Home Depot asks the court to award attorneys' fees and costs in its favor, but does not further explain why fees and costs are justified in this case. (*See* Def.'s Mem. at 15.) Under Title VII, a prevailing defendant may be awarded attorneys' fees if the court finds that the plaintiff's claim was "frivolous, unreasonable, or without foundation." *Christiansburg Grament Co. v. EEOC*, 434 U.S. 412, 421 (1978) (interpreting 42 U.S.C. § 2000e-5(k) in the case of a prevailing defendant). On the other hand, the Seventh Circuit has held that the ADEA permits an award of attorneys' fees to a prevailing defendant only if the plaintiff's allegations were made in bad faith. *E.E.O.C. v. O & G Spring and Wire Forms Specialty Co.*, 38 F.3d 872, 883 (7th Cir. 1994); *see also Malkowski v. PTC Capital Corp.*, No. 96 C 3109, 1998 WL 381050, at *1-2 (N.D. Ill. 1998).

15

Home Depot has made no argument that Miles' claims were either frivolous or made in bad faith, nor does it otherwise explain why an award of attorneys' fees is justified. The court declines to undertake this analysis on its own and accordingly denies Home Depot's request for attorneys' fees.

However, it is clear that reasonable costs other than attorneys' fees "should be allowed to the prevailing party" as a general matter of course. Fed. R. Civ. P. 54(d)(1). Home Depot may submit a bill of costs in accordance with 28 U.S.C. § 1920 and N.D. Ill. Local Rule 54.1, and the itemized costs will be taxed in favor of Home Depot if the court finds such costs to be both reasonable and recoverable. *See Majeske v. City of Chicago*, 218 F.3d 816, 824 (7th Cir. 2000).

## CONCLUSION

For the reasons stated above, Home Depot's Motion for Summary Judgment is granted. Judgment is entered in favor of Home Depot on all of Miles' claims. Home Depot's request for attorney's fees is denied and its request for costs is continued. The court will rule on Home Depot's request for costs once Home Depot has submitted a bill of costs in accordance with the parameters set forth in 28 U.S.C. § 1920 and N.D. Ill. Local Rule 54.1.

ENTER:

JAMES F. HOLDERMAN
Chief Judge, United States District Court

Date: August 28, 2009